Filed 8/22/14  P. v. Medeiros CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B248686 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. LA070072) |
| ANTHONY JOSEPH MEDEIROS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory A. Dohi, Judge.  Affirmed.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Anthony Joseph Medeiros of one count of attempted murder with premeditation and deliberation and one count of assault with a deadly weapon. In this appeal from the judgment of conviction, appellant contends that: (1) the trial court abused its discretion in admitting into evidence a recording of a jailhouse telephone conversation with his mother; (2) the court erred in denying his motion for a new trial based on alleged prosecutorial misconduct; and (3) there is insufficient evidence of premeditation and deliberation to sustain the jury's finding. We find none of his contentions meritorious and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

Appellant lived with his mother, Tina Shadley, and his stepfather, Eugene Hatfield, in an apartment in Valley Village. Javier Acuna lived in an apartment upstairs from appellant. Acuna's friend, Christopher Cisneros, often spent time at Acuna's apartment and knew appellant. The victim, Mathew Lorenceau, lived in an apartment building that was adjacent to appellant's apartment building.

On August 2, 2011, around 9:00 p.m., Lorenceau heard firecrackers being set off at appellant's apartment building. He went outside to his building's parking lot, looked through a missing slat in the fence, and saw people throwing firecrackers. Lorenceau yelled at them to stop, but they could not hear him. Lorenceau then jumped on a wall to look over the fence and saw four men in the parking lot. Lorenceau angrily told them to stop or he would "bash their heads." The men responded by trying to get Lorenceau to come fight with them.

One of the men gestured toward another man whom Lorenceau had not previously noticed. Lorenceau saw the second man, later identified as appellant,

2

start running quickly toward him. Appellant ran between two cars in the parking lot toward the fence where Lorenceau was standing. Appellant jumped and struck Lorenceau in the chest twice. Lorenceau tried to strike back at appellant but was unable to reach him. Lorenceau noticed blood on his shirt and realized appellant had stabbed him.

Lorenceau walked to his neighbor's house for help, and the neighbors called the police. Lorenceau described the group of men to the police using "the N word," although only two of the men were African American, and appellant was white. Lorenceau told his neighbor that "it was those N words across the way," and that the person who stabbed him was "a black man with no shirt, bald head, and lots of tattoos." However, Lorenceau subsequently told officers that his attacker was a bald white man with a square jaw and semi-muscular build and tattoos on both arms.

Cisneros testified that, around 9:00 p.m. on August 2, 2011, he was in Acuna's apartment and heard fireworks and yelling from the back of the apartment building. Cisneros went downstairs to investigate the commotion because he was on parole and wanted to leave if anything was happening. Cisneros saw appellant acting "fidgety," which was how Cisneros reasoned he would behave if he had done "something." Cisneros asked appellant what happened, and appellant told him that "somebody on the other side of the wall was talking shit," that appellant and his friends "got into it with him," and "the dude got stabbed." Cisneros heard appellant say to himself, "fuck that fool," and, "I got that fool." Cisneros advised appellant and appellant's stepfather to leave, which they did.

Lorenceau was in the hospital for six days. Lorenceau told officers that his assailant was "bald looking, Caucasian, with tattoos . . . and pretty muscular build." Los Angeles Police Department Detective Brandy Arzate took a six-pack

photographic lineup to the hospital to show Lorenceau. Lorenceau immediately identified appellant as the assailant, "without any doubt or any hesitation." Lorenceau also identified appellant at trial as his assailant. On August 6, 2011, Detective Arzate asked appellant's parole agent to issue a parole warrant for appellant.

In September 2011, Timothy Ohno, a peace officer for the State of California, was assigned to search for appellant. On January 31, 2012, agent Ohno was conducting surveillance at appellant's mother's apartment when a van was seen leaving the apartment, with Hatfield driving and appellant in the passenger seat. Appellant and Hatfield were arrested. Detective Arzate arrested Shadley at her apartment.

Appellant and Shadley were placed in a patrol car together for transport to jail, and their conversation while they were alone in the car was recorded. In the course of the conversation, the following exchange occurred: "[Shadley]: Take it easy. Just get – I told you that – you should've listened. It is what it is. It's too late, it's a done deal. Should've listened. I told ya. Don't cry, don't cry. [¶] [Appellant]: You ain't got nothing to do with it – it's fucked up. . . . They bang you with this shit dude man. [Inaudible] you and Eugene – constantly I'm fucking you guys up, man. You know I'm fucked. They probably – they want me to do life maybe. You know?"[1]

On March 2, 2012, appellant called his mother from jail. A recording of the conversation was played for the jury and a transcript provided. In discussing

---

[1] The prosecutor played an excerpt of the conversation and provided a transcript of the excerpt for the jury. The court advised the jury that the transcript was "one side's version" of the recording. Defense counsel subsequently played the rest of the conversation, beginning from where the prosecution stopped the recording, and provided its own transcript for the jury.

4

appellant's willingness to plead guilty to a charge of assault with a deadly weapon, appellant made statements tending to acknowledge his guilt of the stabbing:

"[Appellant]:  So fuck.  So they should just hurry up and drop that to a 245.  Come at me with some deal.  You know?

"Shadley:  Yeah.

"[Appellant]:  I might just take the first fucking deal.  You know?  Fuck, come at me with 17.  Come at me with um 17 and under.  I might fucking take it.  You know what I'm sayin?

"Shadley:  Okay.

"[Appellant]:  Shit.  Fuck.  Shit kills me.

"Shadley:  Yeah.

"[Appellant]:  Fuck shit.  *Yeah, but I did that shit to myself.  You know?*

"Shadley:  *I know.*

"[Appellant]:  *Yeah stupid –*

"Shadley:  *Yeah, I agree.*

"[Appellant]:  *Huh?*

"Shadley:  *I agree.*

"[Appellant]:  *Yeah.  Yup.  Yup.  Yup.  People played off my emotions and I fell for it.  Mhmm.  Damn.  They got me.*  That's cool.  Mhmm.  Damn.  Yup.  But uh – shit.  I'm hoping this goes down quick though.  That way I can go wherever.  You know?"  (Italics added.)

*Defense Evidence*

Appellant presented two witnesses whose testimony called into question whether appellant had a tattoo on his neck at the time of the stabbing.

5

David Estephan testified that he owned a mortuary and that appellant's stepfather, Hatfield, worked for him as a driver to pick up bodies. Estephan testified that, on August 2, 2011, Hatfield picked up approximately five bodies. Around 8:30 or 9:00 p.m. that night, Hatfield was sent to pick up a body in Tehachapi and drive it to a mortuary in Sylmar. Estephan stated that Hatfield took appellant with him on most of his calls, but he could not remember if appellant was with Hatfield on August 2.

Hatfield testified that, on August 2, 2011, appellant accompanied him on two pick-ups, one at 5:00 p.m. and the other around 7:30 or 8:00 p.m. Hatfield left for Tehachapi around 8:00 p.m., dropped appellant off at appellant's sister's house in Lancaster, and then continued alone to Tehachapi, returning around midnight. Under cross-examination, Hatfield acknowledged that he never told Detective Arzate that he had dropped appellant off in Lancaster the night of the stabbing. He stated that he did not know at the time because he had not checked the mortuary's records.

Shadley testified that Detective Arzate had warned her she could be arrested for being an accessory after the fact if she did not reveal appellant's whereabouts while the police were searching for him. Shadley believed appellant was innocent and did not want "to turn [appellant] in for something he didn't do."

Shadley also testified that, in the conversation that was recorded in the police car, appellant said, "I know it was somebody," and "It must be Tony, I think it's Tony." Appellant testified that Tony was Cisneros' nickname. Appellant believed that Cisneros lied to the police when he told them that appellant was at home at the time of the stabbing.

Appellant testified that, on August 2, 2011, he was working with Hatfield the entire evening and was not home. He asked Hatfield to take him to Lancaster

6

on the way to Tehachapi, and he did not return until 6:00 the following morning. He denied stabbing Lorenceau. According to appellant, his parole officer had threatened to find him in violation of parole if he did not enter a transition home. Appellant explained that he did not turn himself in to the police for questioning because, when he had done so in the past, it resulted in his arrest for an offense he did not commit.

*Procedural Background*

Appellant was charged by information with attempted murder (Pen. Code, §§ 664/187, subd. (a)) (count 1) and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) (count 2). It was further alleged as to count 1 that appellant used a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)), and as to both counts that appellant inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)). The information alleged that appellant had suffered a prior strike (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), had served three prior prison terms (Pen. Code, § 667.5, subd. (b)), and had suffered a prior conviction of a serious felony (Pen. Code, § 667, subd. (a)(1)).

The jury found appellant guilty of both counts, found that the attempted murder was willful, deliberate and premeditated, and found true the weapon and great bodily injury enhancements. Appellant subsequently admitted to all the prior conviction allegations. Appellant filed a motion for new trial, which the court denied after hearing argument.

The trial court sentenced appellant to a term of 14 years to life as to count 1, plus three years for the great bodily injury enhancement and five years for the prior serious felony conviction, for a total of 22 years. The court struck the prior prison term and deadly weapon allegations in the interest of justice. As to count 2, the

7

court imposed and stayed the sentence pursuant to Penal Code section 654. Appellant filed a timely notice of appeal.

# DISCUSSION

I.     *Admissibility of Telephone Call*

Appellant contends that the trial court abused its discretion in admitting into evidence the recording of the jail telephone call between appellant and his mother. He further contends that the admission of the telephone call violated his right to due process by rendering the trial fundamentally unfair. We disagree.

A.     *Telephone Call and the Court's Ruling*

The pertinent excerpts of the conversation, some of which we have previously set forth, are as follows:

"[Appellant]: Fuck this jail shit. I wanna go over to prison already. You know?

"Shadley: Mhmm.

"[Appellant]: I'm hoping they hurry up and drop that – . . . to a 245 already, you know?

"Shadley: Yeah.

"[Appellant]: Cause it's 245, you know?

"Shadley: Uh huh.

"[Appellant]: It's a 245.

"Shadley: It is?

"[Appellant]: With a GBI. You know?

"Shadley: Uh huh.

8

"[Appellant]: It's a – it's – in all my paperwork, it says a 245 – cutting 245, you know? A fucking ADW, ADW, ADW – assault with a deadly weapon, you know? All over all my paperwork. You know? I only got a couple pieces of paperwork says attempted murder, attempted murder. You know? But everything else is fuckin – and that initial report is a fucking ADW, a 245. You know?

"Shadley: Mhmm.

"[Appellant]: So fuck. So they should just hurry up and drop that to a 245. Come at me with some deal. You know?

"Shadley: Yeah.

"[Appellant]: *I might just take the first fucking deal. You know? Fuck, come at me with 17. Come at me with um 17 and under. I might fucking take it. You know what I'm sayin?*

"Shadley: *Okay.*

"[Appellant]: *Shit. Fuck. Shit kills me.*

"Shadley: *Yeah.*

"[Appellant]: *Fuck shit. Yeah, but I did that shit to myself. You know?*

"Shadley: *I know.*

"[Appellant]: *Yeah stupid –* . . .

"Shadley: *I agree.*

"[Appellant]: *Yeah. Yup. Yup. Yup. People played off my emotions and I fell for it. Mhmm. Damn. They got me.* That's cool. Mhmm. Damn. Yup. But uh – shit. I'm hoping this goes down quick though. That way I can go wherever. You know? . . .

"[Appellant]: You know I fucking hope they kill me. You know? Shit. If they don't, then fuck. Then fuck – more grief. . . .

9

"[Appellant]: Yeah. You know? It should be a 245, man. I know eventually they gonna go to a 245, you know? Yep.

"Shadley: That'd be good.

"[Appellant]: With a GBI, you know?

"Shadley: That'd be good.

"[Appellant]: Yeah. They'll probably give me like fucking – what if it's like uh – you said four years?

"Shadley: Yes.

"[Appellant]: Double up, eight – and then they'll give me uh, one year in prison prior enhancement is nine – and then they throw you up for the uh – for the weapon, on a three year enhancement. You know, so that brings that to twelve, you know? Twelve years right there. You know?

"Shadley: Okay.

"[Appellant]: I would take that. Because upstate, uh – 85's going to 60.

"Shadley: Oh okay.

"[Appellant]: 80%– . . . is going to 60%, so I think I'll – you know?

"Shadley: Oh.

"[Appellant]: I'll only gotta do is like fucking 8 years.

"Shadley: Oh okay.

"[Appellant]: Yep. Yeah, 8, 7 years. That ain't shit.

"Shadley: No, that'd be good.

"[Appellant]: Yep. Yeah. You know, shit – after doing that ten, seven sounds cool.

"Shadley: I hear you.

10

"[Appellant]: You know? Yeah, shit shoot it. I would like to take it all the way. You know? And then there's that fucking chance that jury's not fucking uh – not liking the way I look. You know? Get me.

"Shadley: Yeah.

"[Appellant]: Yep. I got that look." (Italics added.)

Appellant objected to the introduction of the telephone call. The trial court held a hearing pursuant to Evidence Code section 402.[2] Defense counsel argued that the telephone call was inadmissible because it reflected settlement talks. The prosecutor argued that the call was not relevant as evidence of appellant's willingness to accept a plea agreement but as evidence of appellant's guilt, pointing out that appellant never denied committing the offense during the conversation.

The court initially expressed concern about the probative value of the evidence under section 352.[3] The court noted that appellant never admitted committing a crime during the telephone call. Instead, appellant only stated that he was "willing to take a 245," which was a reference to Penal Code section 245, assault with a deadly weapon. The court reasoned that "a willingness to take a determinate sentence, when you're looking at a life term, isn't necessarily an admission."

The trial court subsequently listened to the recording again and decided that it was relevant. The court found the following statements by appellant to be

---

[2]     All unspecified statutory references are to the Evidence Code.

[3]     The statute provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

relevant: "Yeah, but I did that shit to myself"; "people played off my emotions, and I fell for it. They got me"; and "It's a 245, you know." The court reasoned that those statements indicated appellant's belief that his actions constituted assault with a deadly weapon, rather than attempted murder. The trial court accordingly held that those portions of the telephone call were admissible and that the entire conversation was admissible under section 356.[4] We conclude that the trial court did not abuse its discretion in admitting the conversation.

B.    *Applicable Law and Discussion*

"""""Only relevant evidence is admissible [citations], and all relevant evidence is admissible unless excluded under the federal or California Constitution or by statute. [Citations.] Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends '"logically, naturally, and by reasonable inference" to establish material facts . . . . [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence . . . ."""' [Citation.]' [Citation.]" (*People v. Fields* (2009) 175 Cal.App.4th 1001, 1016.)

"""'Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it

---

**4**    Section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption '"substantially outweigh"' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] '"The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'"' [Citation.]' [Citation.]" (*People v. Scott* (2011) 52 Cal.4th 452, 490-491 (*Scott*).) We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*Id.* at p. 491.)

Appellant contends that the telephone conversation had no probative value because he did not admit guilt or provide any details about the crime. He further argues that his comments regarding the possibility of pleading guilty do not indicate that he was actually guilty, but only that he and his mother were discussing how to "avoid a devastating verdict and sentence that they believed was unwarranted."

We disagree. Although appellant did not expressly admit guilt, his statements, reasonably interpreted, strongly suggest that he was acknowledging his guilt of stabbing Lorenceau and blaming himself for his predicament. Thus, in complaining about his situation and discussing his willingness to plead guilty to a charge of assault with a deadly weapon for the stabbing, he acknowledged that he was responsible and had been stupid: "Fuck shit. Yeah, but I did that shit to myself. You know?" Shadley agreed, and appellant added, "Yeah stupid." Then, apparently referring to the circumstances of the argument that preceded the stabbing and being directed by others to stab Lorenceau, appellant said, "Yeah.

13

Yup. Yup. Yup. People played off my emotions and I fell for it. Mhmm. Damn. They got me." Taken as a whole, these comments tended to prove that appellant found himself in custody for stabbing Lorenceau, hoping for a negotiated sentence for assault with a deadly weapon, because he in fact stabbed Lorenceau ("I did that shit to myself. . . . Yeah stupid. . . . Yeah. Yup. Yup. Yup. People played off my emotions and I fell for it. Mhmm. Damn. They got me.").

Appellant relies on *People v. Duarte* (2000) 24 Cal.4th 603 (*Duarte*) to argue that his statements were not sufficiently inculpatory to be admitted. *Duarte* considered whether a witness's statements were admissible under the hearsay exception for declarations against penal interest. (§ 1230.) To be admissible under this exception, the statement must be "specifically disserving to the declarant's interests [citation]." (*People v. Valdez* (2012) 55 Cal.4th 82, 144.) "'[A] hearsay statement "which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible." [Citations.]' [Citation.]" (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1400.)

*Duarte* is inapposite. Appellant does not argue that his statements were inadmissible hearsay, and unlike in *Duarte*, the prosecutor here was not required to show that appellant's statements were so specifically disserving to appellant's penal interests as to qualify as declarations against penal interest. Rather, the inquiry here only required the trial court to determine in its discretion whether the asserted prejudice from introduction of the statements substantially outweighed their clear probative value in acknowledging appellant's guilt. In this inquiry, the trial court did not abuse its discretion.

At trial, appellant sought to explain his incriminating statements. He testified that the reason he repeatedly stated, "It's a 245," was that the original

14

charge was assault with a deadly weapon, not attempted murder. He was concerned about the charge because the sentence for attempted murder would be greater if he was convicted. He also explained that he stated, "Why don't they come at me with some deal?" because he was tired of being in county jail. He explained that he wanted to go to prison because, unlike in jail, he could shave, shower, and not worry about constant fighting.

Appellant further testified that his statement, "I did that shit to myself" was a reference to coming home and getting arrested. His statement, "People played off my emotions, and I fell for it," was a reference to his mother's attempts to move him into the transition home.

Appellant's testimony giving his explanations of his statements does not detract from the fact that, on their face, the statements reasonably suggested that he was acknowledging his guilt of stabbing Lorenceau. Indeed, his testimony describing the meaning of his words tended to lessen any asserted prejudice by presenting the jury with an alternative explanation, one the jury apparently did not credit. In short, the trial court did not abuse its discretion in admitting the conversation.

Because we conclude that the court's decision to admit the evidence was not an abuse of discretion, we further conclude that the admission of the evidence did not render the trial fundamentally unfair.

II.  *Prosecutorial Misconduct*

Appellant contends that the trial court abused its discretion in denying his motions for a mistrial and new trial based on alleged prosecutorial misconduct.[5] He argues that the prosecutor engaged in misconduct during rebuttal argument by accusing defense counsel of altering the transcript of the recording of appellant's conversation with his mother in the police car.

A.  *Disputed Comments and Court's Ruling*

Both the prosecution and the defense provided transcripts of the recording of appellant's conversation with his mother in the police car.  Because defense counsel played the full recording, his transcript contained the entire conversation. As relevant here, defense counsel's transcript contained the following statement by appellant:  "They have several witness [*sic*] (*inaudible*) I wasn't even there.  He's all, 'Well, they said there was a group of black men and one white male.  That's how we know it's you.  They were hanging out with blacks.'"

During closing argument, defense counsel addressed appellant's statements in the conversation with his mother in the police car.  Defense counsel argued that appellant told his mother, "I wasn't even there.  They said it was a black guy and one white guy and therefore it's me."

During rebuttal argument, the prosecutor also addressed the conversation in the police car.  He argued, "[Defense counsel] said in that recording the defendant said at one point, 'I wasn't even there.'  I'm not sure if that's what's in the transcript that you were given, but that's the reason why the transcript is in

---

[5]  Respondent argues that appellant has forfeited this argument by failing to address it in his brief.  We disagree.  Appellant addressed the argument and therefore has not forfeited it.

16

evidence [*sic*]. It's what you heard. That transcript's created by [defense counsel]. The transcripts I'm giving you are transcripts created by me."

Defense counsel responded, "That's not true. That was paid for by the court." The court stated, "Well, bottom line the transcripts, as I've said, are themselves – if you hear something . . . on the audio that's different from the transcripts, go with what you hear. The transcripts are provided by each side as their interpretation of the words on the audio." The court added that if the prosecutor was "saying that [defense counsel] did this himself, that would not be accurate. That's not in the evidence."

The prosecutor continued, "Okay. From the defense. Didn't come from the People. That transcript came from the defense, not from the People." Defense counsel again objected, but the court advised him that there were to be "no speaking objections." The prosecutor added, "as [defense counsel] said in his closing that at the end of the car ride [appellant] said, 'I wasn't even there.' Well, that's not what he said. If you actually listen to that, it says, 'I told them I wasn't even there.' And that's what this has been about."

Defense counsel asked to be heard as to his objection. The court stated, "As I understand it, [the prosecutor] was talking about a transcript and suggesting that there was something in the audio that was not contained on the transcript. This is not an accusation of wrongdoing." Defense counsel replied, "It certainly sounded like it." The prosecutor stated that he did not intend to accuse defense counsel of wrongdoing. The court told the jurors that, "although the lawyers themselves may not have written [the transcripts], they are presented by each side to help you follow along. If you hear something different, go with what you hear. I'm certainly not finding that either side committed any type of misconduct in any way with regard to the preparation of the transcripts."

17

After dismissing the jury, the court told both counsel, "So when it comes to the issue of the transcripts, I think . . . me telling [the jury] that I have found no misconduct and [the prosecutor] . . . saying he's not alleging any should sufficiently address that issue." The court explained that it did not tell the jury, as requested by defense counsel, that "the transcript was prepared at the court's direction or at least at the court's expense," because the court did not ask for the transcript to be prepared. The court added that it had "appointed somebody who the defense recommended, and to somehow suggest that this is a court prepared document, wouldn't be accurate either."

Defense counsel argued, "No, but you could say that was prepared by a third party." He argued that the prosecutor's comment that the transcript was misleading and that the misleading part came from defense counsel directly impugned defense counsel's integrity. He moved for a mistrial, arguing, "To sit there and say, 'oh, you know, this is not in the transcript, but [defense counsel] prepared it,' I don't see how you can interpret that in any possible way. . . . He attacked my credibility, attacked my integrity before the jury for no reason knowing way better that it was done by a third party, I had nothing to do with it. To suggest I did, even in a small way, is wrong."

The court replied that its admonition to the jury that there was no misconduct in the preparation of the transcripts was sufficient to cure any harm. The court thus denied the motion for a mistrial. The court subsequently denied appellant's motion for a new trial, which was based in part on the prosecutorial misconduct claim.

B.    *Applicable Law and Discussion*

We review the denial of a motion for mistrial under the abuse of discretion standard.  (*People v. Montes* (2014) 58 Cal.4th 809, 884.)  "A trial court should grant a motion for mistrial 'only when "'a party's chances of receiving a fair trial have been irreparably damaged'"' [citation], that is, if it is, 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]."  (*People v. Avila* (2006) 38 Cal.4th 491, 573 (*Avila*).)

"'"'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." [Citations.]  "'A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.'"' [Citation.]"  (*People v. Lightsey* (2012) 54 Cal.4th 668, 729.)

"The standards governing review of misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.]'"  (*People v. Parson* (2008) 44 Cal.4th 332, 359 (*Parson*).)

The trial court did not abuse its discretion in denying appellant's motion for a mistrial.  Appellant has failed to establish that the prosecutor's comments constituted "'deceptive or reprehensible methods to persuade the jury'" of appellant's guilt.  (*Parson*, *supra*, 44 Cal.4th at p. 359.)  Even if the prosecutor's comments were improper, appellant's chances of receiving a fair trial were not irreparably damaged by the comments.  (*Avila*, *supra*, 38 Cal.4th at p. 573.)

19

First, the trial court repeatedly admonished the jury that it was to rely on the recording of the conversation, not the transcripts provided by the parties. The jury thus was instructed to determine for itself what appellant said in the conversation.

Second, the record indicates that the prosecutor's comment regarding the transcript was in response to defense counsel's argument that appellant said, "I wasn't even there." When the prosecutor made the disputed comment, he referred to defense counsel's argument and then reminded the jury that the jury was to rely on its own interpretation of the recording, not the transcripts, which were created by the parties.

Third, as the trial court reasoned, the prosecutor himself stated before the jury that he did not intend to accuse defense counsel of wrongdoing in the preparation of the transcript. In addition, the trial court specifically told the jury, "I'm certainly not finding that either side committed any type of misconduct in any way with regard to the preparation of the transcripts." Thus, even if the prosecutor's comment could be seen as impugning defense counsel's integrity, the court's admonition that there was no misconduct in the preparation of the transcripts sufficiently cured any possible prejudice to appellant.

We therefore conclude that appellant has not met his burden of showing a federal constitutional violation by establishing that his trial was infected "'with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.]'" (*Parson*, *supra*, 44 Cal.4th at p. 359.)

Even if the prosecutor's comment did constitute misconduct, if such misconduct does not rise to the level of a federal constitutional violation, we determine, after reviewing the totality of the evidence, if "it is reasonably probable that a result more favorable to defendant would have occurred absent the misconduct. [Citations.]" (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386.)

20

"'Additionally, when the claim [of prosecutorial misconduct] focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 427 (*Ochoa*).)

It is not reasonably probable that a result more favorable to appellant would have occurred absent the alleged prosecutorial misconduct. The conversation between appellant and his mother in the police car was only one piece of evidence in the trial. Cisneros testified that appellant made incriminating comments after the stabbing, such as "I got that fool." Lorenceau testified that he had no doubt that appellant was the person who stabbed him. Detective Arzate similarly testified that Lorenceau immediately identified appellant as his assailant when she showed him the photographic lineup.

Nor is there a reasonable likelihood that the jury construed the complained-of remarks in an objectionable fashion. (*Ochoa*, *supra*, 19 Cal.4th at p. 427.) Again, the trial court admonished the jury that it did not find any misconduct in the preparation of the transcripts, and the prosecutor stated in the jury's presence that he did not intend to accuse defense counsel of wrongdoing.

Appellant relies on *People v. Bain* (1971) 5 Cal.3d 839 (*Bain*), in which the California Supreme Court found that the prosecutor engaged in misconduct. In *Bain*, the complaining witness accused the defendant of rape, but the defendant's version of the events was that he attempted to "pick up" the witness, and she eventually engaged in consensual sex with him. Beginning with *voir dire* and continuing through his closing argument, the prosecutor repeatedly stated that the defendant and his attorney had fabricated the defendant's version of the events. The prosecutor also expressed his personal belief that the defendant was guilty,

declaring that he would not prosecute a man whom he did not believe to be guilty. In addition, the prosecutor made "an argument based on racial prejudice and the status of the public prosecutor's office – a serious threat to objective deliberation by jurors."[6] (*Id.* at p. 849.) The trial court "offered no admonition to the jurors during the entire trial, except to say that defense counsel was not 'drumming up any stories.'" (*Id.* at p. 847.) The California Supreme Court concluded that "[t]he combination of the two elements of such misconduct – the unsupported assertion that the defendant and his counsel fabricated the 'pick-up' story and the statements of personal belief in defendant's guilt, built on a racial foundation – may well have swayed the jury in what was otherwise a close case." (*Id.* at p. 849.)

This case is very different from *Bain*, in which the prosecutor repeatedly impugned both the defendant's and his attorney's credibility, expressed his personal belief that the defendant was guilty, and made comments based on race. Unlike *Bain*, in which the prosecutor explicitly and repeatedly accused defense counsel of fabricating a story, the prosecutor here specifically disavowed accusing defense counsel of misconduct. As discussed above, the court's admonition, the prosecutor's denial that he was accusing defense counsel of misconduct, and the other evidence of appellant's guilt lead us to conclude that appellant's trial was not infected with such unfairness as to render his conviction a violation of due process. (*Parson*, *supra*, 44 Cal.4th at p. 359.)

---

[6] The prosecutor stated several times that he believed the defendant was guilty and "wove these statements into a tight web with comments referring to the fact that he and defendant were both black." (*Bain*, *supra*, 5 Cal.3d at p. 846.)

III.    *Cumulative Error*

Appellant contends that the cumulative error rendered his trial fundamentally unfair, requiring reversal of his conviction.  Because we find no error, we reject this contention.

IV.    *Sufficiency of the Evidence*

Appellant contends that the evidence is insufficient to support his conviction for attempted first degree murder because there is insufficient evidence of premeditation and deliberation.  We disagree.

"The law we apply in assessing a claim of sufficiency of the evidence is well established:  """"[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.""""  [Citation.]  . . .  'We presume "'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  [Citation.]""""  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'  [Citation.]"  (*People v. Perez* (2010) 50 Cal.4th 222, 224.)  "Like first degree murder, attempted first degree murder requires a finding of premeditation and deliberation."  (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1223.)

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.  [Citation.]  However, the requisite reflection need not span a specific or extended period of time.  '"Thoughts may follow each other with great rapidity

23

and cold, calculated judgment may be arrived at quickly. . . .'"' [Citation.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Appellant relies on *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), which considered types of evidence found sufficient to sustain a verdict of premeditated and deliberate murder. *Anderson* "identified three categories of evidence pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 (*Perez*).) Appellant contends that there is insufficient evidence of these three factors to support the finding of premeditation and deliberation.

The California Supreme Court has subsequently explained, however, that "[t]he *Anderson* guidelines are descriptive, not normative. [Citation.] The goal of *Anderson* was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.] [¶] In identifying categories of evidence bearing on premeditation and deliberation, *Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. [Citation.]" (*Perez*, *supra*, 2 Cal.4th at p. 1125; see also *People v. Gonzalez* (2012) 54 Cal.4th 643, 663 [the *Anderson* factors "are not all required [citation], nor are they exclusive in describing the evidence that will support a finding of premeditation and deliberation"].) We therefore consider whether the evidence is sufficient "without belaboring the bullet points of planning, motive, and manner of killing on which . . . *Anderson* focused." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420.)

Appellant contends that his case is similar to *People v. Boatman* (2013) 221 Cal.App.4th 1253 (*Boatman*), which held that the evidence was insufficient to support the first degree murder elements of premeditation and deliberation. The facts of *Boatman* are very different from those presented here.

In *Boatman*, the defendant shot his girlfriend while they were in a bedroom of his family's home. There were other family members in the home at the time, but none of them witnessed the shooting. The defendant gave different versions of what happened, initially telling officers that his girlfriend accidentally shot herself, then stating that he accidentally shot her because he thought the gun was not loaded, and finally stating that he knew it was loaded, but she playfully pointed it at him, and he slapped it away. At trial, he testified that after she pointed the gun at him, he took it and pointed it at her and accidentally shot her. Immediately after the shot, the defendant attempted to give her mouth-to-mouth resuscitation and told his brother to call the police.

The *Boatman* court concluded that there was no planning evidence presented. (*Boatman*, *supra*, 221 Cal.App.4th at p. 1267.) The court pointed out that there was "no evidence that defendant left the room or the house to get a gun, or that he even moved from his squatting position on the floor." (*Ibid.*) The court further reasoned that the "[d]efendant's behavior following the shooting [was] of someone horrified and distraught about what he had done, not someone who had just fulfilled a preconceived plan," noting that he tried to resuscitate his girlfriend, told his brother to call the police, and could be heard crying in the background during the 911 call. (*Ibid.*) The court concluded that "[t]he evidence not only fails to support an inference of a plan to kill [his girlfriend], but strongly suggests *a lack of a plan to kill*." (*Ibid.*)

The court in *Boatman* also found "little or no relevant motive evidence." (*Boatman*, *supra*, 221 Cal.App.4th at p. 1267.) The only motive evidence was a text message from the victim to a friend, stating that she was having a fight with the defendant. The Attorney General relied on this to argue that the jury may have inferred that the defendant was "'in a bad mood after being released from custody and he was angry with [his girlfriend].'" (*Id.* at pp. 1267-1268.)

This case is unlike *Boatman*, in which there was no evidence "that defendant had given any thought or consideration to killing [his girlfriend]." (*Boatman*, *supra*, 221 Cal.App.4th at p. 1271.) Instead, there was sufficient evidence to establish that appellant had a motive for attacking Lorenceau and had time to premeditate and deliberate before running through the parking lot to attack him.

The evidence shows that appellant and other people were involved in an argument with Lorenceau in which they repeatedly urged Lorenceau to come over the fence to fight with them, thus establishing a motive. After someone gestured to appellant, he ran through a parking lot to the fence, jumped up and repeatedly stabbed Lorenceau in the chest. Appellant thus was armed with a weapon, and he had time during the argument with Lorenceau to consider whether he would attack Lorenceau. He responded to someone's gesture to attack Lorenceau, then took the time to run through the parking lot toward the fence. Because Lorenceau was standing on a wall to look over the fence, appellant needed to jump in order to reach Lorenceau, and he jumped not once but twice, stabbing him in the chest both times. All of these actions support the finding of premeditation and deliberation. (See *Boatman*, *supra*, 221 Cal.App.4th at p. 1271 [distinguishing *People v. Harris* (2008) 43 Cal.4th 1269, which found deliberation and premeditation because the defendant's decision to walk from a donut shop service window to the door, where he killed the victim, implied that "he made the decision to kill while he was at the

26

service window and then considered the decision as he walked to the door to commit the murder"].)

""""Premeditation and deliberation can occur in a brief interval.  "The test is not time, but reflection.  'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.""" [Citation.]"""" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)  Engaging in an argument with someone, running toward him through a parking lot, and jumping twice to stab him in the chest is sufficient evidence of premeditation and deliberation "from which a rational trier of fact could find [appellant] guilty beyond a reasonable doubt." (*Ibid.*)

### DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.                    EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27